[Crim. No. 372.    Third Appellate District.—May 9, 1917.]

THE PEOPLE, Respondent, v. JEFF MABRIER, Appellant.

CRIMINAL LAW—CHANGE OF PLACE OF TRIAL—BIAS AND PREJUDICE—
APPEAL.—An application to change the place of trial of a criminal
action on the ground that, owing to the bias and prejudice against
the defendant throughout the county, the defendant could not have
a fair and impartial trial therein, is addressed to the sound discretion
of the trial court, and where error is assigned, a clear case should
be shown by the record, or the appellate court will not interfere.

ID.—IMPANELMENT OF JURY—DISCLOSURE OF FACTS WARRANTING RE-
NEWAL OF MOTION—PROCEDURE.—Where facts are disclosed at the
impanelment of the jury which would warrant a renewal of the
motion for a change of the place of trial, such renewal seems to be
a proper proceeding.

ID.—EXAMINATION OF JURORS—UNWARRANTED INFERENCE OF BIAS.—An
inference of bias and prejudice against the defendant throughout the
county is not warranted from the fact that ten out of thirty-nine
talesmen examined in a county having a population of about six thou-
sand were shown to possess such bias and prejudice.

ID.—OPINIONS OF JURORS—CONTRADICTORY ANSWERS—DUTY OF TRIAL
COURT.—In the impanelment of a jury where talesmen give contra-
dictory answers to questions as to their ability to disregard opinions
which they have formed as to the defendant's guilt based upon news-
paper reports and public rumors, it is the duty of the trial court to
decide which of the answers most truly show the jurors' minds, and
its decision is binding on the appellate courts.

ID.—EVIDENCE—CHANGE IN TESTIMONY—IMPEACHMENT—FOUNDATION.—
In a criminal action a witness who testified differently at the trial
from what he testified to upon a former trial cannot be impeached by
the introduction of his former testimony, where no foundation was
laid for such impeachment while he was on the witness-stand.

APPEAL from a judgment of the Superior Court of
Modoc County, and from an order denying a new trial.    Clar-
ence A. Raker, Judge.

The facts are stated in the opinion of the court.

Jamison & Wylie, and G. P. Johnson, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy
Attorney-General, for Respondent.

CHIPMAN, P. J.—Information was laid by the district attorney of Modoc County charging defendant with the crime of rape upon a female person under the age of eighteen years. He was convicted by the jury and was sentenced by the court to imprisonment in the state prison for the period of forty-seven years.   The appeal is from the judgment of conviction and from the order denying motion for a new trial.

The sufficiency of the evidence to justify the verdict is not called in question.   The point most strongly urged for a reversal is that the court erred in denying defendant's motion, made under section 1033 of the Penal Code, to change the place of trial to some county other than Modoc, on the ground that, owing to the bias and prejudice against him throughout the county, defendant could not have a fair and impartial trial in that county.

It appeared that defendant's conviction was upon the third trial for the same crime, and that at the two former trials there were disagreements, the jury standing eleven for conviction and one for acquittal.   An application for the change of the place of trial was made and denied before the second trial and again before the third trial began.   The application was also made and denied after defendant had exhausted his peremptory challenges but before the jury was completed. The second and third applications were made upon affidavits, newspaper clippings, and the record in the case used at the hearing of the first application, the only additional matter being a newspaper article published after the second trial. It was shown that the comment upon the former trial by the three principal newspapers published in Modoc County were of such character as would have a tendency to prejudice the readers of these papers against defendant in so far as newspaper articles might influence their readers, and it appeared that these papers circulated very generally throughout the county and were read by many people, and, in affidavits submitted at the hearing, the opinion was expressed that these newspaper articles had created such a widespread feeling of bias and prejudice against defendant as to prevent his having a fair and impartial trial in Modoc County.   Affidavits of citizens residing in different parts of the county were read, in which affiants stated that they had talked with many residents of the county and from what they had learned in these conversations they were convinced that defendant could not

have a fair trial in that county. - Counter-affidavits were submitted by the people stating that affiants were widely acquainted with the residents of the county and had talked with many people in various parts of the county since the first trial, and that they, affiants, "had no knowledge of any bias or prejudice existing against defendant in said county or among the citizens of said county," and from their knowledge derived from meeting and talking with citizens of the county, affiants expressed the opinion "that defendant could have as fair a trial in Modoc County as elsewhere."

The statements in the affidavits, both in support of and against the motion, were by persons having apparently equal opportunity to form an opinion as to whether or not a fair trial could be had in Modoc County. Specific instances of persons having been or being influenced adversely to defendant by the newspaper articles referred to are wanting. No affiant mentioned the name of any person with whom he had talked or that any named person exhibited hostility to defendant; nor did any affiant furnish the court with facts from which the court could intelligently determine the value to be given to the opinion of affiant. This is equally true of all the affidavits, for they are but the expression of opinions and conclusions of affiants, "after having talked with many citizens of the county." The newspaper clippings show that they went much beyond a report of the evidence, condemning by name in severe terms the juror who voted for acquittal. In one of these newspapers it was stated that the district attorney had "the case of this juror under advisement and an example may be made of him." But the affidavits did not make clear that these comments of the newspapers had so poisoned or influenced the minds of the citizenry of the county generally as to make it unlikely that a fair and impartial trial could be had in that county.

Applications such as this are addressed to the sound discretion of the trial court, and, as was said in *People* v. *Goldenson*, 76 Cal. 328, 339, [19 Pac. 161, 166] : "Where error is assigned a clear case should be shown by the record, or this court will not interfere. The court below was then in a better position to weigh the statements of the parties and to determine the truth than this court is now."

Where facts are disclosed at the impanelment of the jury which would warrant a renewal of the motion for a change

of the place of trial, such renewal seems to be a proper proceeding. (*People* v. *Staples*, 149 Cal. 405, 412, [86 Pac. 886].) Our attention is called to the fact that ''at this trial thirty-nine talesmen were examined before a jury of twelve men to try the defendant were secured. Ten of these talesmen whose residences are scattered throughout Modoc County swore upon their *voir dire* that they could not give the defendant a fair and impartial trial, on account of their bias and prejudice.'' It is stated that the population of Modoc County is about six thousand. It does not appear to us that the number of talesmen examined was unusually large or that the fact that ten out of this number disqualified themselves on the ground of bias would justify the inference sought to be drawn from it. We cannot say that the court abused its discretion in overruling defendant's motion.

Error of the court is claimed in overruling defendant's challenge for cause against Talesman Osmund Ratcliffe and sustaining plaintiff's challenge against W. C. Clark. Ratcliffe was examined at great length on his *voir dire,* in the course of which he stated that he had formed an opinion in the case unfavorable to defendant and that his ''mind was set''; that his opinion was formed from rumors; that he had not talked with any witness in the case nor with any of the former jurors. ''Q. And you have made up your mind that if you were accepted as a juryman you would be against him? A. Yes, sir. Q. If you were sworn to try the case you would be against him? A. My mind is made up.'' At this point the challenge was interposed. In reply to questions by the district attorney, Ratcliffe stated that he had not talked with any witness and had formed an opinion from ''current talk.'' He was asked if he would try the case ''upon those rumors, or try it upon the evidence introduced here. A. Well, I don't think there would be any evidence to change my mind at all. . . . Q. Is it your understanding that you are to try the case upon the evidence and not upon rumors? A. Yes, sir. Q. If you were accepted as a juror, wouldn't you try the case upon the evidence? A. Well, I don't know.'' He testified that if he was himself upon trial he would accept a juror in his frame of mind and that ''if the evidence should not be like what he had heard he would go according to the evidence''; that he had no prejudice against defendant personally, and that he ''could give the defendant a fair and impar-

tial trial on the evidence. The Court: Do you understand, Mr. Ratcliffe, that when you are sworn as a juror, it is your duty to try the case upon the evidence presented here alone, and not upon public rumor; do you understand that to be the law? A. Yes, sir. Q. If you were accepted as a juror in this case, would you try it solely upon what you hear in court, upon the evidence only? A. Yes, sir; I would have to." He also testified that notwithstanding any opinion he then had he would lay aside that opinion and try the case solely on the evidence. "Mr. Jamison (Defendant's Attorney): Q. Mr. Ratcliffe, if that opinion is in your mind, it is a strong opinion, and it would go with you into the jury-box, and after they began to introduce evidence, would it not? A. No, I think I could go according to the evidence. Q. But you would have that opinion until sufficient evidence has been introduced to overcome it? A. Yes, sir. Q. You have a strong fixed opinion in your mind that this defendant is guilty? A. No, I could not say that. Q. Do you think you could lay that opinion aside and try the case wholly on the evidence, or would that opinion influence you? A. No, I don't think so. I don't think it would influence me. The Court: The challenge is disallowed." Ratcliffe was still further interrogated: "Mr. Wylie (Defendant's Attorney): Q. Mr. Ratcliffe, do you understand that under the law a man is presumed to be innocent until his guilt is proven? A. Yes, sir. Q. Would you accord the defendant the benefit and protection of that law if you were accepted as a juryman? A. Yes, sir. Q. Would you insist that the people in this case prove his guilt to a moral certainty and beyond a reasonable doubt before you find him guilty? A. Yes, sir. Q. And you will do so? A. Yes, sir. Q. Will you try this case on the evidence and nothing else? A. Sure. Q. Will you take the law regulating and controlling this case from the court, as instructed by the court from his instructions? A. Yes, sir. . . . Q. Will you try this case irrespective of outside opinion or what the public might say? A. I would act according to the evidence." Ratcliffe was one of the first twelve called to the jury-box and was peremptorily challenged by defendant.

In the case of *People* v. *Ryan*, 152 Cal. 364, 371, [92 Pac. 853, 856], certain jurors impaneled to try the case gave contradictory answers upon the subject of their ability to disregard opinions as to defendant's guilt, which they had formed

from newspaper reports and public rumors. Said the court: "Many persons, competent as jurors, have not given much attention to such subjects, are inexperienced as witnesses, and are unable readily to comprehend the force and effect of the language in which such questions are couched, and they generally answer without reflection as to the effect of their own words. Such contradictions are by no means infrequent, if, indeed, they are not the rule, rather than the exception. The trial court must decide which of the answers most truly shows the juror's mind. It should, of course, be liberal in giving the defendant and the people the benefit of any doubts that may arise as to the fairness of the juror or his ability to lay aside preconceived impressions and should excuse the juror if such doubt is created. But where there are such contradictions, its decision is binding upon this court." (Citing cases.)

It is urged that the examination of Juror Clark showed a similar state of mind to that of Ratcliffe's, except that he had formed an opinion favorable to defendant and that to be consistent the court should have refused the district attorney's challenge of Clark for cause. What was said as to the ruling in Ratcliffe's case applies to Clark's. The trial court was charged with the duty of resolving the contradictions in the answers of these jurymen and "its decision is binding upon this court." The foregoing will apply equally to Jurymen Dannhauser and McDaniels, the latter having been called as a juror after defendant had exhausted his peremptory challenges.

Error is assigned because of the refusal of the court to allow defendant's attorney, Wylie, to testify that he had a conversation with the father of the complaining witness the day after the alleged assault, "about having an examination of Mary to determine whether or not sexual intercourse had been had with her"; and whether or not at the preliminary examination of defendant he applied to the court for an examination of this kind by a competent physician. The record shows that, upon stipulation of counsel and by order of the court, eight days after the alleged offense was committed, such an examination was made by three physicians and their testimony appears in the record. We see no prejudicial error in the ruling.

The witness, Frank Hardin, a boy of fifteen years of age, testified at a former trial that he followed the defendant and

the prosecuting witness and saw them at the place where the crime was alleged to have been committed, and that nothing of the kind happened there. When called at the present trial, to the disappointment and surprise of defendant's attorney, he said he was not at this place, and admitted that he did not tell the truth at the former trial. Hardin left the witness-stand and was not again recalled. Attorney Wylie was sworn and asked to state whether or not, just before being called as a witness, Hardin had not stated that his testimony would be the same as at the former trial. Objection was made and sustained that no proper foundation for Hardin's impeachment had been laid. An offer was then made to introduce the testimony of Hardin given at the last trial. The ruling was not error. No foundation was laid while Hardin was on the stand as a witness for his impeachment. The reading of his former testimony was properly refused. To have warranted its being read to the jury, Hardin's attention should have been called to it, and he should have been asked if he made the answers theretofore given by him. Upon his denial it would have been permissible to show that he testified as claimed by defendant at the former trial.

Witness L. F. Gill was called by defendant and the following questions were asked: ''Q. I will ask you to state whether or not at that time he stated to you that he had followed Jeff Mabrier and Mary Ostrom across the field, where they had gone to the place where it is alleged that the rape was committed upon the girl, and that no such act had been committed. Q. I will ask you what he told you or said to you in reference to the act charged in this case and whether such act had been committed or not.'' Objection that no proper foundation had been laid and that the questions were incompetent, immaterial, and leading was sustained. Clearly, inasmuch as no question had been asked the witness Hardin which would serve as a foundation for the impeaching questions propounded, the court properly sustained the objection.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 5, 1917.